# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WINKLEVOSS CAPITAL FUND, LLC, a Delaware Limited Liability Company, TYLER WINKLEVOSS, and CAMERON WINKLEVOSS, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | **C.A. No. 2018-0398-JRS** |
| STEPHEN SHAW, THE WESTERMAN TRUST U/T/D FEBRUARY 25, 2011, and TREATS!, LLC, a Delaware Limited Liability Company, | : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted:  January 14, 2019
Date Decided:  March 1, 2019

P. Clarkson Collins, Jr. and Albert J. Carroll, Esquire of Morris James LLP, Wilmington, Delaware and Charles J. Harder, Esquire of Harder LLP, Beverly Hills, California, Attorneys for Plaintiffs.

Richard G. Placey, Esquire of Montgomery McCracken Walker & Rhoads, LLP, Wilmington, Delaware; Carlos F. Gonzalez, Esquire of Rimon, P.C., Coral Gables, Florida; and Matthew Pace, Esquire of Rimon, P.C., New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs, brothers Tyler and Cameron Winklevoss, through Winklevoss Capital Fund, LLC, made a substantial investment in an upstart magazine operated by Defendant, Treats! LLC, and founded by Defendant, Stephen Shaw. Plaintiffs allege they have not achieved the return on investment promised them by Defendants and that Shaw's mismanagement of Treats! is to blame. Defendants deny the allegations of mismanagement and bring counterclaims against the Winklevoss brothers in which they allege the brothers breached commitments to allow Treats! to announce and capitalize on the publicity surrounding the brothers' investment. According to the counterclaims, the brothers made their investment in Treats! soon after the release of the movie *The Social Network* in which their association with the social networking site, Facebook, was depicted. Shaw allegedly accepted the investment, in part, based on the brothers' commitment that Treats! could announce (presumably with some fanfare) that the brothers had selected Treats! as one of the first investments of their newly created firm, Winklevoss Capital Fund, LLC. The counterclaims purport to state claims for fraud, fraudulent inducement, "fraudulent misrepresentation" and promissory estoppel.

Defendants have moved to dismiss the counterclaims on multiple grounds, including that the claims are barred by laches and by a fully integrated contract governing the parties' relationship that makes no mention of the brothers' alleged commitment to promote Treats!. In rare circumstances, the Court may apply laches

1

at the pleadings stage to bar a claim when it is clear on the face of the claim that it is untimely and that equity would not be offended by the claim's dismissal. This is especially so when the claimant brings common law claims and seeks common law remedies after the applicable statute of limitations has expired. That is what Defendants/Counterclaim Plaintiffs have done here. Accordingly, Plaintiffs' Motion to Dismiss Defendants' Counterclaims as time barred must be granted.

## I. BACKGROUND

I draw the facts from the allegations in the counterclaims, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[1] As I must, I have accepted as true the counterclaims' well-pled factual allegations and have drawn all reasonable inferences from those allegations in Defendants' favor.[2]

---

[1] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint)); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 776 (Del. Ch. 2009).

[2] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

## A. The Parties

Plaintiffs and Counterclaim Defendants, Cameron and Tyler Winklevoss ("Cameron" and "Tyler," respectively),[3] are businessmen, investors and entrepreneurs. Plaintiff, Winklevoss Capital Fund, LLC ("WCF"), is their investment firm.[4] WCF is a Delaware limited liability company with its principal place of business in New York.[5]

Defendant and Counterclaim Plaintiff, Stephen Shaw, is a professional photographer and the founder and manager of Defendant and Counterclaim Plaintiff, Treats!, LLC.[6] Treats! is a Delaware limited liability company with its principal place of business in Los Angeles, California.[7] Its members are located in California and New York.[8] Treats!, founded in April 2010, owns and operates Treats!

---

[3] Since the brothers share the same last name I refer to them here by first names, intending no disrespect.

[4] Winklevoss Ver. Compl. for Breach of Contract and Fiduciary Duty ("Compl.") ¶¶ 6–7, 18–19.

[5] Compl. ¶ 5.

[6] Compl. ¶¶ 1, 14; Defs.' Answer ("Answer") ¶ 14; Shaw Verified Countercl. for Common Law Fraud, Fraudulent Inducement and Misrepresentation, and Promissory Estoppel ("Countercl.") ¶¶ 2, 10, 12.

[7] Answer ¶ 4.

[8] *Id.*

magazine, a print and digital magazine depicting nude and semi-nude photography of models and celebrities.[9]

Shaw is the settlor, trustee and sole beneficiary of Defendant and Counterclaim Plaintiff, The Westerman Trust u/t/d/ February 25, 2011 (the "Trust").[10] In March 2011, Shaw transferred his entire interest in Treats! to the Trust.[11]

## B. WCF Invests in Treats!

In early 2011, a mutual friend introduced Shaw to Cameron and Tyler. When they met Shaw, Cameron and Tyler were seeking to strengthen their Los Angeles network. Shaw, a professional photographer well known to many celebrities, opened the door to his social circle for Cameron and Tyler by introducing them to his friends, inviting them to exclusive dinners and parties and photographing their various girlfriends.[12]

When Cameron and Tyler learned about Treats!, they were intrigued and offered to invest in the company. They emphasized to Shaw the potential significance of the fact that Treats! would be the first investment they made through

---

[9] Compl. ¶¶ 1, 15; Answer ¶¶ 2, 15; Countercl. ¶ 12.

[10] Compl. ¶ 9; Answer ¶ 9; Countercl. ¶ 3.

[11] Compl. ¶ 17; Answer ¶ 17.

[12] Countercl. ¶ 11.

4

their newly-formed investment firm, WCF. Shaw believed Treats! would develop into a lifestyle brand and he thought a partnership with WCF would provide the perfect launch pad. The notoriety of the Winklevoss brand following the release of the blockbuster film, *The Social Network*, in which the brothers were depicted, was the main attraction for Shaw as he sought to secure their investment in, and promotion of, Treats!.

By July 2011, Cameron, Tyler and Shaw were deciding how publicly to announce WCF's forthcoming Treats! investment. In late 2011, Tyler wrote Shaw to report that he had "toured treats [sic] with my parents. . . . My parents loved it, they totally got it and were hooked (especially my dad lol). We all concluded that treats [sic] is the worlds [sic] best kept secret . . . its [sic] time for everyone to know about it!"[13] Tyler concluded, "our brand can help in a lot of ways."[14]

On August 15, 2012, WCF invested $1,310,000 in Treats! in exchange for 1,310,000 series A preferred units under a written Purchase Agreement by and between WCF, Treats! and the Trust (the "Purchase Agreement"), to which an Amended LLC Agreement for Treats! (the "Amended LLC Agreement") was appended.[15] Both the Purchase Agreement and Amended LLC Agreement contain

---

[13] Countercl. ¶ 15.

[14] *Id.*

[15] Compl. ¶ 24; Answer ¶ 24; Countercl. ¶ 16.

integration clauses stating that the contracts contain the entire agreement among the parties and requiring that any additional agreements be set forth in separate writings signed by all parties (Treats!, WCF and the Trust).[16]  On October 26, 2012, Treats! delivered a written promissory note to WCF reflecting a loan to Treats! in the amount of $20,000 (the "October 2012 Promissory Note").[17]

## C. The Parties' Relationship Quickly Unravels

Following WCF's investment, the parties' relationship was marked by a consistent refrain.  Shaw pressed the brothers to promote Treats! while the brothers pressed Shaw to enhance their personal and professional profiles.  For example, Defendants allege that, on October 4, 2012, Tyler asked Shaw to arrange a "special casting" with multiple women he selected from Facebook and a modeling agency's

---

[16] Compl. ¶¶ 3, 26–28; Answer ¶¶ 26–28.  Specifically, Section 15.06(a) of the Amended LLC Agreement states the Amended LLC Agreement, along with certain other attachments to the Purchase Agreement "constitutes the sole and entire agreement of the parties with respect to the subject matter contained herein and therein and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral . . . ."  Compl. ¶ 26; Answer ¶ 26.  Section 6.1 of the Purchase Agreement (which includes the Amended LLC Agreement) provides, in pertinent part: "This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein."  Compl. ¶ 27; Answer ¶ 27.  Section 15.09 of the Amended LLC Agreement provides, in pertinent part, that the agreement can only be amended or modified by an instrument in writing executed by all parties (Treats!, WCF and the Trust).  Compl. ¶ 28; Answer ¶ 28.

[17] Compl. ¶ 25; Answer ¶ 25.

website.[18]  Tyler followed this request on October 17, 2012, with further direction to Shaw: "[d]on't hire any of them . . . get their details and call the hot ones up, invite them, and then I can shag them ;)."[19]  Shaw refused.

On June 4, 2012, Cameron wrote to Shaw thanking him for offering to speak to actor Kevin Spacey about doing a voice-over for Zum-Zero, a website the brothers were promoting that they hoped would host the world's largest on-line investor community.[20]  On November 13, 2012, Tyler asked Shaw and his team at Treats! to promote Hukkster, another of the brothers' investments.  Treats!'s then-Chief Operating Officer, Farley Cahen, responded: "until [Cameron and Tyler] announce publicly that they have invested in . . . Treats!, I think promoting sites like Hukkster or other 'off-brand' sites will fall on deaf ears . . ."[21]  Both Cameron and Tyler initially indicated that they agreed with this sequencing, but then pressed Shaw again to promote Huckster without having yet taken any steps to promote Treats!.[22]  On November 14, 2012, Tyler asked Shaw to connect him with television and radio

---

[18] Countercl. ¶ 19.

[19] Countercl. ¶ 20.

[20] Countercl. ¶ 24.

[21] Countercl. ¶ 25.

[22] Countercl. ¶ 29.

personality, Ryan Seacrest, so that Tyler could inquire whether Seacrest might be willing to assist the brothers in promoting the Winklevoss brand.[23]

As the brothers sought Shaw's assistance to promote their own profiles, Shaw continued to solicit the brothers' assistance in promoting Treats!.[24] After failing to make any progress on this front, and then having heard from the brothers that they no longer wished to be a part of Treats!, on December 11, 2012, Shaw emailed Tyler to express his frustration:

> An express condition of the sale to you was that I would be able to announce your investment to the World.
>
> * * *
>
> Now you are telling me [you] not only do not want me to announce, but you wish to sell your shares and any reasonable offer will be entertained.
>
> * * *
>
> If [y]ou are adamant that I do not make such an announcement and 'that seems to be the case' then kindly, by return, make me a proposal that will involve ultimately, us entering into a confidentiality agreement to protect the secrecy of your investment that seems to suddenly have become a priority to you both.[25]

---

[23] Countercl. ¶ 30.

[24] Countercl. ¶ 32–35.

[25] Countercl. ¶ 36.

Shaw's frustration grew in 2013, as the brothers continued in their refusal to promote Treats!. In an email to the brothers dated June 17, 2013, Shaw wrote, "you promised to announce your involvement & strung me along milking it for months until you made it clear that you did not want to tell anyone that you were my partners and my investors." He concluded that email by noting that the brothers' failure to honor their commitment had adversely affected him and Treats!: "Now I'm not the first investment. I'm just some mug who got you into a scene you wanted to be in and have been totally suppressed and financially effected [sic]."[26]

As Shaw was accusing the brothers of failing to honor their promise to promote Treats!, the brothers were accusing Shaw of mismanagement and failing to grow Treats! as promised.[27] According to Plaintiffs, while Shaw promised them that Treats! would be published at least quarterly, Shaw only managed to get the magazine published twice per year.[28] And rather than strengthen the online readership and advertising revenue, it is alleged that Defendants spent money on Shaw's personal entertainment, food, travel and gifts.[29]

---

[26] Countercl. ¶ 38.

[27] Compl. ¶ 30.

[28] *Id.*

[29] Compl. ¶¶ 1, 30, 31.

9

Plaintiffs first raised their concerns about mismanagement in November 2012. Thereafter, from December 2012 through June 2013, the parties exchanged attacks and ripostes with Plaintiffs alleging mismanagement and Defendants alleging breach of the brothers' promises to promote Treats!.[30] The brothers proposed that Shaw buy them out at a price that would allow them to achieve some positive return on their investment. Shaw rejected that proposal and countered that he would buy-out WCF at a deep discount. That proposal was rejected.[31] The parties then threatened each other with legal action.[32]

While the brothers declined to make any conciliatory overtures toward Shaw at any time from 2013 through 2018, they also did not take steps to break the relationship. For his part, Shaw approached at least two companies to help raise capital in an effort to continue operations and ultimately reorganize the company.[33] He also periodically would inquire whether WCF was willing to redeem its interest in Treats! at a discount, including a rebuffed proposal in 2018.[34]

---

[30] Compl. ¶ 32; Countercl., ¶¶ 32, 36, 38.

[31] Compl. ¶¶ 2, 33–35; Answer ¶ 35; Countercl. ¶¶ 36–38, 42.

[32] Compl. ¶ 37.

[33] Countercl. ¶ 40.

[34] Countercl. ¶ 42.

## D. Procedural Posture

Plaintiffs filed their Complaint on June 1, 2018, in which they assert four causes of action: (Count 1) Breach of the Amended LLC Agreement based on Defendants' mismanagement of the assets of Treats!; (Count 2) Breach of the October 2012 Promissory Note based on Treats!'s failure to repay the amount owed to WCF under the Note; (Count 3) Breach of Fiduciary Duty based on Shaw's and the Trust's misappropriation of Treats!'s funds and/or assets; and (Count 4) Declaratory Relief for a judicial determination that Plaintiffs have no contractual obligations to Defendants to market or promote Treats!.[35]

On July 11, 2018, Defendants filed an Answer and Counterclaims in which they assert five causes of action against all Plaintiffs: (Count 1) Common Law Fraud; (Count 2) Fraudulent Inducement; (Count 3) Fraudulent Misrepresentation; (Count 4) Common Law Fraud; and (Count 5) Promissory Estoppel. Each of these claims arise out of the brothers' alleged promise at the outset of their association with Treats! that they would "publicly announce their investment in Treats! and use their personal brand to help grow the company" as a means "to induce Mr. Shaw and

---

[35] Compl. ¶¶ 40–61; Countercl. ¶¶ 36–38.

11

Treats! to partner with [Plaintiffs] and to perform numerous personal and professional favors for [Plaintiffs]."[36]

Plaintiffs moved to dismiss Defendants' counterclaims on July 31, 2018.

## II. ANALYSIS

The standards governing a motion to dismiss for failure to state a claim are well-settled. "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[37] When deciding a motion to dismiss, the Court must read the complaint liberally, accept as true all well-pled allegations and draw all reasonable inferences in favor of the non-moving party.[38] Even still, the trial court is not required blindly to accept as true all conclusory allegations "without specific supporting factual allegations."[39]

---

[36] *See* Countercl. ¶¶ 1, 17–18, 36, 38, 45–67.

[37] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[38] *Gen. Motors (Hughes)*, 897 A.2d at 168.

[39] *Santa Fe Pac. Corp.*, 669 A.2d at 65–66.

## A. The Proper Application of Laches to the Counterclaims

Defendants are correct that the laches defense is often fact-intensive and, therefore, not readily susceptible to adjudication at the pleadings stage.[40] But "[t]here is no rule barring [laches] as the basis for dismissal under Rule 12(b)(6) where 'it is clear from the face of the complaint that [laches] exists and that the plaintiff can prove no set of facts to avoid it.'"[41]

In cases where the asserted claims are common law claims seeking common law remedies, this court has made clear that a "plaintiff 'should not be placed in a potentially better position [having filed in Chancery] to seek to avoid a statute of limitation than if she had filed in a Delaware court of law by invoking the more flexible doctrine of laches.'"[42] Indeed, "a filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of

---

[40] *See, e.g.*, *Stewart v. Wilm. Trust SP Servs., Inc.*, 112 A.3d 271, 295 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015) (noting that the "defense of laches is not ordinarily well-suited for treatment on a Rule 12(b)(6) motion.") (internal quotation marks omitted); *Reid v. Spazio*, 970 A.2d 175, 183 (Del. 2009) (explaining that in "ruling on a motion under Court of Chancery Rule 12(b)(6), the Court is generally limited to facts appearing on the face of the pleadings. Accordingly, affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion. Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate.").

[41] *Reid*, 970 A.2d at 183–84.

[42] *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *5 (Del. Ch. Nov. 2, 2017), *aff'd*, 2019 WL 244619 (Del. Jan. 17, 2019) (TABLE) (quoting *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 976 (Del. Ch. 2016)).

laches . . . and prejudice to defendants is thus presumed."[43] In such cases, "absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."[44]

Delaware's statute of limitations for claims sounding in fraud or promissory estoppel claims is three years.[45] And "[t]he statute of limitations [in such cases] begins to run when a plaintiff's claim accrues, which occurs at the moment of the wrongful act and not when the effects of the act are felt."[46] Thus, a claim for

---

[43] *Baier v. Upper New York Inv. Co. LLC*, 2018 WL 1791996, at *11–12 (Del. Ch. Apr. 16, 2018). *See also CMS Inv. Hldgs., LLC v. Castle*, 2016 WL 4411328, at *2 (Del. Ch. Aug. 19, 2016) ("[T]he Court will bar claims outside the limitations period absent tolling or extraordinary circumstances, even in the absence of demonstrable prejudice.") (internal quotations omitted).

[44] *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); *see also Daugherty v. Highland Capital Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) (courts need not engage in traditional laches analysis for a presumptively late complaint, and where "a claim is brought in Chancery that would be barred by a statutory limitation if brought at law, the same claim will be barred here by analogy to the statute, absent 'extraordinary circumstances.'"); *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013) ("Where a party files a claim after the presumptive period, the claim is likely time-barred except in the rare and unusual circumstance that a recognized tolling doctrine excuses the late filing. . . . The Court does not need to engage in a traditional laches analysis for a presumptively late complaint.") (internal quotations omitted); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005) ("[W]here the analogous statute of limitations at law has run, a plaintiff is barred from bringing suit without the necessity of the court engaging in a traditional laches analysis.").

[45] 10 *Del. C.* § 8106; *Chrysler Corp., (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1035 (Del. 2003); *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 n.50 (Del. Super. Apr. 16, 2014); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004).

[46] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *6 (Del. Super. Feb. 15, 2013) (quoting *Airport Bus. Ctr. V LLLP v. Sun Nat'l Bank*, 2012 WL 1413690, at *7 (Del. Super.

common law fraud accrues on the day the misrepresentation is made.[47]  Similarly, "[a] claim for fraudulent inducement accrues when the fraudulent statements were made, which must be on or before the date when the parties entered into the contract."[48]  A claim for promissory estoppel accrues when the alleged promise behind the claim is broken.[49]

When "'a complaint asserts a cause of action that on its face accrued outside the statute of limitations,' the plaintiffs have the burden to plead facts 'leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies.'"[50]  The doctrines of fraudulent concealment, inherently unknowable injuries and equitable tolling will toll the applicable limitations period only when "the facts underlying a claim were so hidden that a reasonable plaintiff could not

---

Mar. 6, 2012)).  Accrual starts "even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

[47] *Van Lake*, 2013 WL 1087583, at *7; *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008).  I note, contrary to Defendants' argument on pages 23–26 of their Answering Brief, that their fraud and promissory estoppel claims accrued as of the date of fraud, not as of some event during the continuum of performance of the parties' governing contract.  Thus, the "continuing contract" accrual analysis is not applicable because the counterclaim does not assert a breach of contract claim. *See Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015); *Chrysler Corp. (Del.)*, 822 A.2d at 1035–36.

[48] *Pivotal Payments Direct*, 2015 WL 11120934, at *4.

[49] *Chrysler Corp. (Del.)*, 822 A.2d at 1035–36.

[50] *Commonwealth Land Title Ins. Co. v. Funk*, 2014 WL 8623183, at *6 (Del. Super. Dec. 22, 2014) (quoting *Winner Acceptance Corp.*, 2008 WL 5352063, at *14).

15

timely discover them."[51] "In order to toll the statute of limitation under the fraudulent concealment exception, [therefore], the plaintiff must allege some affirmative act by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[52] Similarly, to invoke the doctrine of inherently unknowable injuries, the plaintiff must allege facts that would allow an inference that "it would be practically impossible for [him] to discover the existence of a cause of action. . . . [and] that he was 'blamelessly ignorant' of both the wrongful act and the resulting harm."[53] Equitable tolling, likewise, is not available to a plaintiff after he "knew or had reason to know of the facts constituting the wrong."[54]

## B. Laches Bars The Counterclaims

The allegations in the counterclaims reveal that Defendants' claims accrued for statute of limitations (and laches) purposes no later than June 17, 2013.[55] Each

---

[51] *See Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006).

[52] *Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *10 (Del. Ch. July 19, 2016) (quoting *Smith v. Mattia*, 2010 WL 412030, at *5 (Del. Ch. Feb. 1, 2010)) (internal quotations omitted).

[53] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 788–89 (Del. Ch. 2014) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 584–85 (Del. Ch. 2007)).

[54] *Seiden v. Kaneko*, 2015 WL 7289338, at *8 (Del. Ch. Nov. 3, 2015) (quoting *Tyson Foods, Inc.*, 919 A.2d at 585).

[55] Countercl., ¶¶ 31–32, 38.

of Defendants' four fraud claims arise from the Winklevoss brothers' allegedly false promise to "publicly announce their investment in Treats! and use their personal brand to help grow the company" as a means "to induce Mr. Shaw and Treats! to partner with [Plaintiffs] and to perform numerous personal and professional favors for [Plaintiffs]."[56]  According to Defendants, this false representation convinced them to enter into the written Purchase Agreement, including the Amended LLC Agreement, on August 15, 2012, and then to assist the brothers in their desire to gain entrée into Shaw's social circles for their personal and business purposes.[57]  Shaw questioned the veracity of the brothers' promise to promote Treats! as early as December 11, 2012, when he emailed Tyler to confirm that the brothers had informed him they would not promote Treats! and to express his frustration with this development.[58]  By June 17, 2013, Shaw's frustration had turned to an appreciation that the brothers had "[taken] what [they] wanted" from Shaw but had no intention of honoring their commitment to Treats!.[59]

---

[56] *See* Countercl. ¶¶ 1, 17–18, 45–62.

[57] *See* Countercl. ¶ 45 ("As part of the negotiations, the Winklevoss twins falsely represented to Mr. Shaw that they would use their personal brand to promote Treats! . . . ."); *see also* Countercl. ¶¶ 1, 13, 17, 46, 51, 56, 61.

[58] Countercl. ¶ 36.

[59] Countercl. ¶ 38.

Defendants argue the statute of limitations should be tolled because "repeated efforts over many years to get the Winklevoss twins to [promote Treats!] were met with excuses, delay, and further promises which, ultimately, turned out to be untrue."[60] While the counterclaims do not allege anything about "further promises" by the Winklevoss brothers to promote Treats! beyond their initial commitment at or around the time of their investment, even if there were "further promises," it "became clear" to Defendants at least as early as June 17, 2013, that Plaintiffs had no intention to promote Treats! then or ever.[61] Thus, the fraud and promissory estoppel claims accrued no later than June 17, 2013.[62]

---

[60] Countercl. ¶ 46; *see also* Countercl. ¶¶ 51, 55, 61.

[61] Countercl. ¶ 38 ("you made it clear you wouldn't say anything of your investment in Treats!"). In addition, Defendants' counterclaims also quote a December 11, 2012 email from Shaw to Tyler and Cameron, demonstrating Defendants discovered the falsity of Plaintiffs' alleged representations by that date. Countercl. ¶ 36 ("Now you are telling me not only do you not want me to announce [WCF's investment in Treats!]. . . . If you are that adamant that I do not make such an announcement and 'that seems to be the case' . . . .").

[62] Defendants' Answering Brief reasserts these dates and again concedes that Shaw discovered the alleged facts underlying Defendants' claims no later than June 17, 2013. Defs.' Answering Br. in Opp'n to Pls.' Mot. to Dismiss ("Defs.' Answering Br.") at 1 (Defendants state Shaw wrote to Plaintiffs regarding their alleged refusal to publicly announce their investment in Treats! four months after "going into business" with Plaintiffs in 2012.); Defs.' Answering Br. 7 (Defendants allege, "by June of 2013 . . . Mr. Shaw believed that they were breaching their agreement by failing to personally promote and help grow Treats!.").

The statute of limitations governing each of the counterclaims expired no later than June 17, 2016.[63] They were filed more than two years later, on July 11, 2018, and are, therefore, time-barred absent tolling.[64]

## C. Defendants Have Failed to Demonstrate "Unusual Conditions" or "Extraordinary Circumstances"

In the realm of laches, a late-filed claim may be excused in "rare" instances when the claimant can demonstrate "unusual conditions" or "extraordinary circumstances."[65] While these terms have not been precisely defined,[66] our courts have consistently considered certain factors when determining whether to excuse late-filed claims as a matter of equity, including: (1) whether the plaintiff brought his claim, through litigation or any other means, before the statute of limitations expired; (2) whether the delay in filing suit can be explained by a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether

---

[63] *See, e.g.*, *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *5 (Del. Ch. Nov. 2, 2017).

[64] *See, e.g.*, *Maddox v. Collins*, 2015 WL 5786349, at *1 (Del. Super. Oct. 5, 2015) (granting motion to dismiss and holding "[b]ecause all facts that plaintiff is alleging in this case were known to him more than three years prior to the filing of this action, the statute of limitations period has expired and this action [including the plaintiff's fraud claim] must be dismissed with prejudice."); *Airport Bus. Ctr. V LLLP*, 2012 WL 1413690, at *1 ("[P]laintiffs' claims for fraud, negligent misrepresentation, and breach of lease are barred by the statute of limitations and those claims will therefore be dismissed with prejudice.").

[65] *See Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 772 (Del. 2013); *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 179 (Del. 2011).

[66] *Levey*, 76 A.3d at 770; *Stewart*, 112 A.2d at 293–94, *aff'd*, 126 A.3d 1115 (Del. 2015).

the delay in filing suit can be explained by a legal decision in another jurisdiction; (4) whether the defendant knew of, or participated in, any prior proceedings; and (5) whether, at the time the litigation began, a genuine dispute existed regarding the soundness of the claim.[67]

Defendants maintain that the application of these factors mandate the conclusion that their otherwise time-barred claims should survive dismissal. I disagree. As explained below, there are no "unusual conditions" or "extraordinary circumstances" present here.

### 1. Defendants Did Not Pursue Their Counterclaims Before the Statute of Limitations Expired

Defendants argue this factor is satisfied because: (a) Shaw "sent numerous communications to [Cameron and Tyler] regarding their fraudulent misrepresentations" and "to notify them of his claims";[68] (b) Shaw's attorney sent a letter on April 24, 2018, in which he advised the Defendants that Plaintiffs were preparing to file suit;[69] and (c) Shaw's attorney sent additional correspondence some time thereafter in which he described the evidence that would support the

---

[67] *O'Brien*, 26 A.3d at 178; *Levey*, 76 A.3d at 770.

[68] Defs.' Answering Br. 19; Countercl. ¶ 38. Defendants reference the email Shaw sent to Cameron and Tyler on June 17, 2013, as support for this contention.

[69] Compl. ¶ 37.

Defendants' claims.[70] Of these communications, only the June 17, 2013 email was sent before the statute of limitations expired on Defendants' counterclaims. Yet even this communication does not reflect that Defendants had pursued their claims "through litigation or otherwise" as contemplated by *O'Brien*.[71] In *BioVeris Corp.*, the plaintiff argued that it satisfied the first *O'Brien* factor by sending two letters to defendants demanding payment and then initiating negotiations to resolve the plaintiff's claims before expiration of the limitations period.[72] The court rejected the argument and held that sending letters stating legal positions and proposing settlement "was not sufficient pursuit of the claims to qualify under the first" *O'Brien* factor.[73] The court went on to say, "[t]hese two letters do not rise anywhere near the same level of diligence exercised by the plaintiffs in *Levey* . . . ."[74] *BioVeris* is directly on point. Shaw's expressions of frustration with Defendants in 2012 and 2013 are a far cry from actually pursuing claims against them.

Indeed, in each of the cases cited by Defendants where the courts found "unusual conditions" or "extraordinary circumstances" under the first *O'Brien*

---

[70] Compl. ¶¶ 38, 39. *See* Defs.' Answering Br. 19–20.

[71] *O'Brien*, 26 A.3d at 178.

[72] *BioVeris Corp.*, 2017 WL 5035530, at *11–12.

[73] *Id*. at *11–12.

[74] *Id*. at *12.

factor, the claimant took clear steps to pursue their claims, either by filing a lawsuit in another forum or initiating an arbitration action before the limitations period expired.[75]  Defendants had every opportunity to do just that, but they inexplicably chose not to until after Plaintiffs filed this lawsuit well beyond the expiration of the statute of limitations on the counterclaims.  They have failed, therefore, to meet the first *O'Brien* factor.

## 2. No Material and Unforeseeable Change in Defendants' Personal or Financial Circumstances Caused the Delay in Filing Suit

Defendants argue they meet this second *O'Brien* factor because the negotiations relating to Plaintiffs' separation from Treats! broke down after the

---

[75] *Levey*, 76 A.3d. at 766–67, 771 (Plaintiff—Levey—satisfied the first factor before the limitations period expired by: (1) previously asserting the same claim by filing a counterclaim against the defendants in an action brought by the defendants in the Southern District of New York; (2) sending a letter to the defendants one year later requesting payment and warning pursuit of legal remedies; (3) filing a motion to stay the Southern District of New York case and compelling defendants to submit to arbitration; and (4) after the court granted this motion, filing a formal demand for arbitration before the Financial Industry Regulatory Authority); *O'Brien*, 26 A.3d. at 175, 176–77, 178 (Plaintiff O'Brien met the first factor in an action for indemnification against IAC, which was the parent company of PRC, by: (1) seeking identical indemnification from PRC in a prior arbitration matter; (2) filing suit in Florida against PRC for indemnification while the arbitration was still pending; and (3) appealing the ruling on PRC's motion for summary judgment related to the indemnification claim in the Florida case); *Stewart*, 112 A.3d at 293–95 (Plaintiff, a receiver, adequately pursued its breach of contract, breach of fiduciary duty and negligence claims against the defendants before the statute of limitations expired by: (1) serving process on the defendants in a related liquidation action; (2) conducting "extensive litigation activity" in the liquidation action, which was necessary before the receiver could sufficiently plead its claims against defendants in the instant action; and (3) engaging in "an extensive investigation" related to the defendants' conduct, which included obtaining and reviewing documents from some of the defendants.).

statute of limitations expired. After it became clear Plaintiffs would not honor their promise to promote Treats!, Shaw attempted to negotiate a buy-out of Plaintiffs' interests.[76] The brothers never budged from their position that they would not separate from Treats! for any less than their $1.3 million initial investment.[77] Shaw steadfastly refused to pay that much, repeatedly reminding Plaintiffs that he had put his "heart, soul, and every penny" into Treats! and that he had been "totally suppressed and financially effected" by their failure to honor their promise to promote the magazine.[78]

Nothing in this history suggests that Defendants were prevented from asserting their counterclaims by "a material and unforeseeable change in the parties' personal or financial circumstances." The parties' negotiating positions did not waiver before the statute of limitations expired; they did not waiver after. All of Defendants' settlement overtures were "to no avail."[79] There was no "unforeseeable change in the parties' . . . circumstances."[80]

---

[76] Defs.' Answering Br. 20.

[77] *Id.*; Countercl. ¶ 37.

[78] Defs.' Answering Br. 20–21; Countercl. ¶ 38. *See also* Countercl. ¶¶ 41, 42 (recounting failed attempts to buy-out WCF).

[79] *Id.*

[80] *O'Brien,* 26 A.3d. at 178. In *O'Brien*, the court found material and unforeseeable circumstances supporting O'Brien's delay in filing suit because: (1) O'Brien could not in good faith proceed against IAC when his appeal against IAC's subsidiary, PRC, remained

### 3. No Legal Decision Prevented the Filing of the Counterclaims

Defendants wisely make no argument that "the delay in filing suit can be explained by a legal decision in another jurisdiction."[81] This is the only litigation the parties have pursued against one another and there has been no decision in unrelated litigation in another jurisdiction that would have prevented Defendants from timely pursuing their counterclaims.

### 4. There Have Been No Prior Proceedings

Defendants maintain this factor justifies their untimely filing because they were aware of, and filed their counterclaims in response to, a "prior proceeding" as contemplated by the fourth *O'Brien* factor, namely this proceeding as initiated by Plaintiffs on June 1, 2018.[82] Setting aside the fact that the instant proceeding can hardly be characterized as a "prior proceeding" under any reasonable construction of that phrase, to invoke this factor, the untimely claimant must identify prior proceedings that were initiated before the limitations period expired.[83] This action,

---

pending for over a year; and (2) PRC unexpectedly declared bankruptcy. *Id.* Nothing like this has been alleged here.

[81] *O'Brien*, 26 A.3d at 178.

[82] Defs.' Answering Br. 21–22.

[83] *See Levey*, 76 A.3d at 766–67, 771 (the prior Southern District of New York proceedings and the arbitration proceedings both took place before the limitations period for Levey's claims expired); *O'Brien*, 26 A.3d at 176, 178 (the prior arbitration proceedings, Florida action and the appeal all occurred before O'Brien's claims expired); *Stewart*, 112 A.3d at

"prior" or not, was initiated well after the statute of limitations on the counterclaims had run.

### 5. There Was No Bona Fide Dispute Regarding the "Soundness" of Defendants' Claims at the Time of Filing

Defendants maintain "there is a bona fide dispute as to the validity of Mr. Shaw's claims."[84]  Of course, they do not elaborate on this point beyond simply parroting the fifth *O'Brien* factor.

"The Supreme Court interprets a 'bona fide dispute' to mean that the claim would survive a motion to dismiss or, in other words, is not futile."[85]  In application, this factor is most commonly fulfilled by a previous affirmative court finding that the untimely claims are valid.[86]  No such finding has been made with respect to the counterclaims.  Moreover, even if there had been a prior finding that Defendants

---

294–96 (the related liquidation action and the receiver's extensive investigation both occurred before the expiration of the statute of limitations).

[84] Defs.' Answering Br. 22.

[85] *Daugherty*, 2018 WL 3217738, at *7, citing *Levey*, 76 A.3d at 771–72.

[86] *See O'Brien*, 26 A.3d at 179 (finding this factor satisfied because the Florida trial and appellate courts had both previously found O'Brien's indemnification claim to be meritorious); *Levey*, 76 A.3d at 771–72 (holding Levey's indemnification claim, which had been brought earlier in the Southern District of New York and in arbitration, would survive a motion to dismiss).

possessed "sound" counterclaims, this alone would be insufficient to excuse Defendants' failure to file the claims on time.[87]

## D. Equitable Tolling Does Not Apply Here

Defendants maintain that the brothers' "repeated misstatements of fact" triggers equitable tolling.[88] Delaware courts will apply equitable tolling in rare cases "where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[89] When the claimant alleges that tolling is justified because defendants' fraud obscured the existence of the claim, the tolling doctrine of fraudulent concealment, not equitable estoppel, provides the proper analytical framework.[90] That doctrine permits tolling only where the plaintiff has pled the

---

[87] *See BioVeris Corp.*, 2017 WL 5035530, at *12 ("The mere existence of a bona fide dispute at the time the suit was filed does not justify a finding of extraordinary circumstances when the weight of the other factors cuts against such a finding.").

[88] Defs.' Answering Br. 27.

[89] *Krahmer v. Christie's Inc.*, 903 A.2d 773,778 (Del. Ch. 2006). I note that equitable tolling typically applies to salvage untimely claims for breach of fiduciary duty. *See Albert*, 2005 WL 1594085, at *19 ("Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary."). No such claim has been alleged in the counterclaims, and for good reason. *See Kuroda v. SPJS Hldgs., L.L.C.*, 2010 WL 925853, at *7 (Del. Ch. Mar. 16, 2010) (dismissing defendant's breach of fiduciary duty counterclaim against plaintiff because "[plaintiff] was neither a manager of [defendant LLC] nor a controlling member, and he thus has no fiduciary duties.").

[90] *Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *10 (Del. Ch. July 19, 2016) (quoting *Smith v. Mattia*, 2010 WL 412030, at *5 (Del. Ch. Feb. 1, 2010) (internal quotations omitted) ("In order to toll the statute of limitation under the fraudulent concealment exception, the plaintiff must allege some affirmative act by the defendant that

26

conditions comprising the fraudulent concealment, and how such conduct prevented him from discovering his claim, with the same particularity as would be required to plead an affirmative claim of fraud.[91]

Defendants have not carried their burden under any of the tolling theories they have proffered for the simple reason that facts giving rise to their counterclaims were never hidden from them.[92] This is clearly revealed in Shaw's own words in 2013 when he acknowledged that Plaintiffs had "made it clear" they did not intend to promote Treats!.[93] Thereafter, Plaintiffs consistently turned down each of Defendants' offers to buy-out WCF's interest.[94] No facts have been pled in the counterclaims that would allow a reasonable inference that Plaintiffs somehow concealed Defendants' potential fraud and promissory estoppel claims from them.

---

either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth.").

[91] *See CMS*, 2016 WL 4411328, at \*4, citing *Boeing Co. v. Shrontz*, 1992 WL 81228, at \*3 (Del. Ch. Apr. 20, 1992) ("The allegations of fraudulent concealment necessary to toll the statute of limitations must be set forth with the particularity required by Chancery Court Rule 9(b).").

[92] *First State Towing, LLC v. Div. of State Police*, 2016 WL 2621137, at \*4 (Del. Ch. May 5, 2016) (quoting *Capano v. Capano*, 2014 WL 2964071, at \*9 (Del. Ch. June 30, 2014)); *Owens*, 2013 WL 5496821, at \*2 (holding that equitable tolling assumes the plaintiff "was prevented in some extraordinary manner from timely asserting his rights").

[93] Countercl. ¶ 38.

[94] Defs.' Answering Br. 29–30; Countercl. ¶ 42.

Defendants were well aware of these potential claims; they simply failed to file them on time.

## III.    CONCLUSION

For the reasons stated above, I am satisfied Defendants' counterclaims must be dismissed as time-barred because they were filed after the expiration of three-year statute of limitations and no tolling doctrine applies.  With that said, Defendants may present evidence of Plaintiffs' alleged fraud and broken promises in order to set off any potential damages arising from the affirmative claims asserted against them.[95]  In this regard, I note that Defendants have asserted as affirmative defenses fraud, fraudulent inducement, fraudulent misrepresentation, and unclean hands, among others, based on the same facts alleged in the counterclaims.  I can discern no basis to restrict Defendants from presenting evidence of the Defendants' failure to honor agreements to promote Treats! as grounds to defend against Plaintiffs'

---

[95] *King Const., Inc. v. Plaza Four Realty, LLC*, 2012 WL 3518125 at *4 (Del. Super. Aug. 7, 2012) ("Ordinarily a defendant may amend a pleading to assert an affirmative defense even where the statute of limitations or other considerations would bar the assertion of a substantially similar counterclaim."); *PNC Bank, Del. v. Turner*, 659 A.2d 222, 225 (Del. Super. 1995) (permitting an affirmative defense of recoupment where the defendant's proposed counterclaim would have been barred by the statute of limitations, finding "the underlying policy of the statute of limitations is not promoted by suppressing a valid defense arising out of a transaction" and the "purpose of statutes of limitation is to bar actions and not to deny matters of defense.  As a general rule, such statutes are not applicable to defenses, but only where affirmative relief is sought. [. . .] It would therefore be appropriate for [defendant] to plead her claims [. . .] defensively whether or not they would be barred if pleaded affirmatively.").

claim that Defendants have not delivered all that was promised.  Counterclaims based on this evidence, however, are time-barred.

For the foregoing reasons, the Motion to Dismiss Defendants' Counterclaims must be **GRANTED**.

**IT IS SO ORDERED.**