# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ERIK HOLZBAUR, )
)
Plaintiff, )
)
v. ) C.A. No. 2023-0181-MTZ
)
TROLLEY SQUARE HOSPITALITY, LLC, )
a Delaware limited liability company, and )
ERIC C. SUGRUE, )
)
Defendants. )

## MEMORANDUM OPINION

Date Submitted: May 15, 2025
Date Decided: June 4, 2025

John R. Weaver, Jr., JOHN R. WEAVER, JR., P.A., Wilmington, DE, *Attorney for Plaintiff Erik Holzbaur.*

Mark A. Denney, Jr., BROCKSTEDT MANDALAS FEDERICO LLC, Wilmington, DE, *Attorney for Defendants Trolley Square Hospitality, LLC, and Eric C. Sugrue.*

**ZURN, Vice Chancellor.**

The limited liability company affords great flexibility to those who adopt it to organize their enterprise. Many take advantage of that flexibility by drafting a bespoke limited liability company agreement. But if that agreement is contradictory or confusing, flexibility begets friction.

Here, the parties entered into a limited liability company agreement to operate a restaurant in Wilmington's Trolley Square neighborhood. The plaintiff acted as its general manager. The agreement created two classes of members: those who contributed cash, and those who did not. Both classes received distributions. The managing member could remove noncash contributing members, ending their distributions. The managing member could not remove cash contributing members. The company's limited liability company agreement treats the plaintiff's membership inconsistently. One provision explicitly states his membership is in exchange for sweat equity. Another provision, and an exhibit attached to the agreement, say he contributed cash.

After the plaintiff resigned as the restaurant's general manager, the company's managing member removed the plaintiff as a noncash contributing member, and the plaintiff's distributions stopped. The plaintiff sued, asserting he was a cash contributing member who enjoyed a continuing right to membership and distributions.

Whether the plaintiff was a cash contributing member or a noncash

1

contributing member is an issue of contract interpretation. This post-trial opinion concludes the agreement is ambiguous, then looks to extrinsic evidence to discern the parties' intent. The extrinsic evidence shows the parties intended for the plaintiff to contribute sweat equity, not cash. It is undisputed that he contributed no cash. Because the plaintiff was a noncash contributing member, he was validly removed. He is no longer a member and is owed no distributions.

## I. BACKGROUND[1]

This decision follows a half-day trial with three live witnesses and ten exhibits. Plaintiff Erik Holzbaur bears the burden to prove his claims by a preponderance of the evidence.[2] The following facts were stipulated by the parties or proven at trial.

---

[1] Citations in the form "[last name] Tr. –" refer to trial testimony of the referenced witness, available at docket item ("D.I.") 47. Citations in the form "PTO at –" refer the parties' joint pretrial order, available at D.I. 45. Citations in the form "PTOB at –" refer to the plaintiff's post-trial opening brief, available at D.I. 50. Citations in the form "PTAB at –" refer to the defendants' post-trial answering brief, available at D.I. 51. Citations in the form "PTRB at –" refer to the plaintiff's post-trial reply brief, available at D.I. 52.

[2] *REM OA Hldgs., LLC v. N. Gold Hldgs., LLC*, 2023 WL 6143042, at *26 (Del. Ch. Sept. 20, 2023), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE). Holzbaur implies the defendants carry the burden. PTOB at 7. But "[a]s the party seeking enforcement of his interpretation of the . . . Agreement, [Holzbaur] bears the burden to prove his breach of contract claim by a preponderance of the evidence." *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013); *see also Lillis v. AT & T Corp.*, 2008 WL 2811153, at *4 (Del. Ch. July 21, 2008) ("As the party seeking judicial enforcement of their interpretation of an ambiguous contract, the plaintiffs bear the burden of proof in this action."), *aff'd*, 970 A.2d 166 (Del. 2009).

### A. The Parties Join Up.

Holzbaur and defendant Eric Sugrue met over a decade ago in connection with a now-closed restaurant: Holzbaur was its general manager, and Sugrue was an investor.[3] In 2015, Sugrue decided to open a new restaurant, which would become Trolley Square Oyster House (the "Restaurant") in Wilmington, Delaware.[4] Sugrue had a good rapport with Holzbaur and believed he would be an asset, and invited Holzbaur to help open the new restaurant.[5] Holzbaur agreed, believing their restaurant could see success.[6] Sugrue formed Trolley Square Hospitality, LLC (the "Company") to create and operate the Restaurant.[7]

Before Sugrue formed the Company, Holzbaur and Sugrue repeatedly discussed Holzbaur's role in the Company.[8] They agreed Holzbaur would be the Restaurant's general manager, running its day-to-day operations.[9] In exchange, he would be a member in the Company, entitled to equity and distributions.[10] Holzbaur

---

[3] Holzbaur Tr. 7–8, 11; Sugrue Tr. 75.

[4] Holzbaur Tr. 11; Sugrue Tr. 76–77.

[5] Sugrue Tr. 77.

[6] Holzbaur Tr. 8.

[7] *See* JX 1 [hereinafter "Agr."].

[8] Holzbaur Tr. 15, 37; Sugrue Tr. 95 ("We had many conversations. Not one, not 10, but I would say probably more than 15."). Holzbaur was also involved in early decisions about the Restaurant; he attended the initial site visit with Sugrue. Holzbaur Tr. 9–10.

[9] Holzbaur Tr. 11, 18, 21.

[10] *Id.* 15.

and Sugrue described Holzbaur's contribution as "sweat equity."[11]  Holzbaur "understood that to be a contribution of labor in exchange for equity in the business."[12]  This was a good deal for Holzbaur:  it is uncommon for restaurant general managers who do not invest cash to receive distributions.[13]

Sugrue and Holzbaur had another discussion about his role in the Company at a local coffee shop, along with a third Company member, Holly Monaco.[14]  Sugrue "wanted to make sure everyone understood what the circumstances were."[15]  Holzbaur agreed to act as general manager; Monaco would act as co-director of operations.[16]  All agreed Sugrue and the fourth member, Stuart Stafman, would be the only members who put money into the business.[17]  Holzbaur and Monaco would not contribute any cash.[18]  Monaco understood she was a sweat equity member who contributed no cash to the business.[19]  And she had no expectation to be treated as a cash contributing member if she left the Company.[20]

---

[11] *Id.* 21; Sugrue Tr. 78.

[12] Holzbaur Tr. 20.

[13] Sugrue Tr. 78.

[14] Monaco Tr. 53–55; Sugrue Tr. 79.

[15] Sugrue Tr. 79.

[16] Monaco Tr. 54.

[17] *Id.* 55.

[18] *Id.*

[19] *Id.* 54–56.

[20] *Id.* 59.

Sugrue and Holzbaur did not discuss what percentage of ownership each member would have.[21] Sugrue alone determined Holzbaur would have a 14% stake.[22] Sugrue came to that determination knowing that Holzbaur would work long hours as general manager getting the Restaurant off the ground.[23] He wanted to "incentivize and to reward" Holzbaur's hard work.[24]

Sugrue drafted the Trolley Square Hospitality, LLC Limited Liability Company Agreement (the "Agreement").[25] On December 23, 2015, Sugrue sent Holzbaur some or all of the Agreement.[26] Holzbaur reviewed the attachment, "looking to see the setup of the business," and signed the same day.[27]

The Agreement provides the Company was "organized to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide and otherwise deal

---

[21] Holzbaur Tr. 18–19; Sugrue Tr. 77–78.

[22] Sugrue Tr. 77.

[23] *Id.* 78.

[24] *Id.*

[25] *See generally* Agr.; Sugrue Tr. 85–86; Holzbaur Tr. 16; Monaco Tr. 70.

[26] Holzbaur Tr. 13, 16. There is a factual dispute over whether Holzbaur was sent the entire agreement to sign or just select pages. Holzbaur testified that he received the pages that described him as a sweat equity member and a cash contributing member. Holzbaur Tr. 13–14. Holzbaur agreed he is bound by the entire Agreement, so I need not resolve that factual dispute. *See Holzbaur v. Trolley Square Hospitality, LLC*, C.A. No. 2023-0181-MTZ, at 17–18 (Del. Ch. May 15, 2025) (TRANSCRIPT); *see also Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989).

[27] Holzbaur Tr. 14–16; PTO at 4.

in the restaurant business."[28]  Section 9.20 lays out the "General Understanding of this agreement & partnership," as follows:[29]

> Eric Sugrue decided to move forward and purchase 'Satsumi' restaurant located at 1707 Delaware Ave, Wilmington Delaware. The building/land, contents, goodwill, furniture, fixtures & equipment will be owned by Trolley Square Properties, LLC(landlord). TSH will lease the entire property, along with all of its contents from TSP. The rent amount has not yet been determined but it will be a triple net lease and all expenses will be paid by TSH. Structural building issues will be the responsibility of TSP.  Erik Holzbaur will become the General Manager and operating partner. He will take responsibility for all of the day to day operations. He is receiving a 14% interest in this company based on sweat equity. Same for Holly. This type of partnership will allow this restaurant to not have to fall under the same umbrella as the rest of the BFRG locations. Cash distributions will be paid out based on cash equity first and will continue until all cash equity has been returned. Once returned, cash will be distributed based on pro rata percentage interest in the company. Cash reserves will be determined by Eric Sugrue. The plan is to build the business to a point where sales exceed $1.5-$2m. Once profitable, we will discuss an exit strategy that is in the best interest of all the members. The plan and idea is for all of this to take 3-5 years.[30]

Section 9.20 is formatted differently than the rest of the Agreement:  Sugrue wrote it himself to set forth the parties' fundamental understanding.[31]

---

[28] Agr. § 2.3.

[29] *Id.* § 9.20.

[30] *Id.*

[31] *Id.*; Sugrue Tr. 81.

The Agreement lists four members: Sugrue, Holzbaur, and nonparties Stafman and Monaco.[32] Sugrue is the Company's manager.[33] The Agreement empowers him to "remove non cash contributing members."[34] "Non cash contributing members" is undefined. Per the Agreement, "[r]emoved members will no longer have any rights to profits or cash."[35] "If a member is removed from the company for any reason, their percentage interest will be split amongst the rest of the members at their appropriate pro rata percentage."[36] Cash contributing members, on the other hand, cannot be removed by the manager and receive distributions unless they withdraw from the Company.[37]

Section 3.1 of the Agreement states that "[t]he Members have contributed to the Company cash or property in the amounts respectively set forth on Exhibit A."[38] Exhibit A is a chart of the members, their capital contributions, and percentages of ownership.[39] It lists Holzbaur as owning 14% of the Company, Sugrue as owning

---

[32] Agr. Ex. A.

[33] *Id.* § 5.1.1.

[34] *Id.* § 5.1.2.11.

[35] *Id.*

[36] *Id.* § 6.1.

[37] *See id.* § 5.1.2.11; *id.* §§ 6.2–6.3.

[38] *Id.* § 3.1.

[39] *Id.* Ex. A.

7

51%, Stafman as owning 25%, and Monaco owning 10%.[40] Exhibit A also lists each member's "Initial Cash Capital Contribution," which aligns with each member's ownership: Holzbaur at $14, Sugrue at $51, Stafman at $25, and Monaco at $10.[41]

Sugrue lifted Exhibit A from an old agreement and changed the names and percentages.[42] The Company's members did not perform consistently with Section 3.1 and Exhibit A. It is undisputed that Holzbaur and Monaco contributed no cash, while Sugrue and Stafman contributed much more than $51 and $25.[43] Sugrue listed those cash contributions to align with their ownership stake, not to reflect actual cash contributions.[44]

### B.     Holzbaur Leaves The Restaurant.

The Restaurant opened in or around April 2016.[45] Holzbaur served as general manager for nearly six years. He worked twelve hours a day, five to seven days a

---

[40] *Id.*

[41] *Id.*

[42] Sugrue Tr. 86.

[43] *Id.* 86–88.

[44] *Id.* 86–87.

[45] Holzbaur Tr. 18, 22.

week, getting the business off the ground.[46] He did "a hell of a job."[47] The Restaurant saw success and became "a great neighborhood bar."[48]

In exchange, Holzbaur received cash distributions, after Sugrue and Stafman were repaid for their cash investments.[49] Holzbaur received approximately $282,000 in distributions.[50] A year or two after the Restaurant opened, Sugrue gave Holzbaur the opportunity to invest one of his distributions into the Company.[51] Holzbaur kept the cash.[52]

In the fall of 2021, Holzbaur decided to leave the food service industry, and resigned as the Restaurant's general manager.[53] Holzbaur asked Sugrue how he would receive his distributions moving forward. Sugrue told Holzbaur he would no longer be receiving distributions.[54] Sugrue, Holzbaur, and Monaco met and went over the Agreement, and Sugrue explained why Holzbaur would no longer be receiving distributions.[55] Sugrue removed Holzbaur as a member under Section

---

[46] *Id.* 20.

[47] Sugrue Tr. 83.

[48] Monaco Tr. 67.

[49] Agr. § 9.20; Holzbaur Tr. 38.

[50] DX 3.

[51] Sugrue Tr. 83–84.

[52] *Id.*

[53] Holzbaur Tr. 23–24; Monaco Tr. 60–61; PTO at 4.

[54] Holzbaur Tr. 25.

[55] *Id.* 26–27; Monaco Tr. 62; Sugrue Tr. 91–92.

5.1.2.11.[56]  Holzbaur was last paid a distribution in or around November 2021.[57]

### C.     Litigation Ensues.

Holzbaur sued Sugrue, the Company, Stafman, and Monaco on February 14, 2023.[58]  Count I sought certain financial records from the Company under Section 8.4 of the Agreement and 6 *Del. C.* § 18-305.[59]  Count II asserts Holzbaur's distributions were wrongfully withheld from him and requests remuneration.[60]  Count III alleges Holzbaur's distributions were wrongfully redistributed to other members.[61]

On December 1, 2023, I dismissed Holzbaur's Section 18-305 claim and dismissed Monaco and Stafman as defendants.[62]  The matter proceeded to trial, held on January 9, 2025.  Holzbaur dropped Count I at trial.[63]  The parties tried Count II against the Company and Count III against Sugrue (together with the Company,

---

[56] Sugrue Tr. 89–90.

[57] PTO at 4; Holzbaur Tr. 27.

[58] D.I. 1 [hereinafter "Compl."].

[59] *Id.* ¶¶ 12–15.

[60] *Id.* ¶¶ 16–19.  This count, like the others, was not explicitly pled as a breach of contract.  Instead, the complaint titled the claims by the relief sought:  financial data, renumeration, and contributions.  But as explained in my bench ruling on the defendants' motion to dismiss, these are well-pled breach of contract claims.  D.I. 14 at 15–22.

[61] Compl. ¶¶ 20–23.

[62] D.I. 14 at 22.

[63] *See* PTO.

10

"Defendants").[64]  The parties submitted post-trial briefing and presented post-trial argument on May 15, 2025.[65]

Holzbaur contends he was removed, and his distributions were withheld, in breach of the Agreement.  He seeks approximately $98,000 in unpaid cash distributions, and a declaration that he was not properly removed and is still a 14% member of the Company.[66]  He asserts that because Section 3.1 and Exhibit A list him as having contributed money, he is a cash contributing member and so Sugrue could not remove him as a member.  Defendants assert Holzbaur was not a cash contributing member, as reflected by Section 9.20's statement that he received membership in exchange for sweat equity.  Under Defendants' interpretation, Holzbaur was a noncash contributing member, and Sugrue validly removed him as a member.

## II.    ANALYSIS

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[67]  Here, the parties dispute only the nature of the contractual obligation, i.e., how to read the Agreement.  This case hinges on one

---

[64] D.I. 14; Compl. ¶¶ 16–23.

[65] D.I. 55.

[66] PTOB 14; Holzbaur Tr. 29.

[67] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

question: Was Holzbaur a cash contributing member under the Agreement? If he was, Sugrue could not have removed him as a member, and the Company owes him distributions.[68] If Holzbaur was a noncash contributing member, then Sugrue could remove him, and Defendants prevail. For reasons I will explain, I agree with Defendants that Holzbaur was a noncash contributing member. Judgment will be entered in their favor.

### A. Holzbaur Was A Noncash Contributing Member.

"A contract's express terms provide the starting point in approaching a contract dispute."[69] "[I]t is well-settled that a court should not venture beyond the four corners of an agreement when its express terms are unambiguous."[70] "Delaware law adheres to an objective theory of contracts, under which a court does not resort to extrinsic evidence 'to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity' when the contract terms are unambiguous."[71] "Contract terms are not ambiguous merely because the parties to the contract

---

[68] Defendants also argue that Holzbaur is no longer a member because he voluntarily withdrew from membership. Holzbaur contends he resigned only as general manager and not as a member. Because I find Sugrue validly removed Holzbaur, I do not reach this issue.

[69] *Ostroff v. Quality Servs. Lab'ys, Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007), *aff'd*, 177 A.3d 610 (Del. 2017) (TABLE).

[70] *Id.* at *7.

[71] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997)).

disagree; rather, the court 'stand[s] in the shoes of an objectively reasonable third-party observer,' and ascertains whether the contract language is unmistakably clear."[72]  "The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'"[73]  "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[74]

The first step is to discern the meaning of "noncash contributing member." The Agreement does not define that term, so I look to its ordinary meaning.[75]  I interpret the term to mean a member who has not contributed cash to the Company.

The next step is to discern if the Agreement identifies Holzbaur as a noncash contributing member.  The Agreement is ambiguous on that point.  Exhibit A states Holzbaur made an initial cash contribution of $14.  And Section 3.1 of the Agreement explains that "[t]he Members have contributed to the Company cash or

[72] *Id.* (quoting *Dittrick v. Chalfant*, 2007 WL 1039548, at *4 (Del. Ch. Apr. 4, 2007)).

[73] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[74] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014).  "This is true notwithstanding the presence of a routine integration clause." *Eagle Indus.*, 702 A.2d at 1233 n.10; *see* Agr. § 9.3.

[75] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006); *Navient Sols., LLC v. BPG Off. Prs. XIII Iron Hill LLC*, 315 A.3d 1164, 1173 (Del. Super. Ct. 2024) ("A term that is not otherwise defined is to be given its ordinary meaning.").

property in the amounts respectively set forth on Exhibit A."[76]  Those parts of the Agreement would make Holzbaur a cash contributing member.  But Section 9.20 states Holzbaur "receiv[ed] a 14% interest in this company based on sweat equity."[77]  Black's Law Dictionary defines sweat equity as "[f]inancial equity created in property by the owner's labor in improving the property."[78]  That provision provides he did not contribute any cash, and so is a noncash contributing member subject to removal.

Section 9.20 directly conflicts with Section 3.1 and Exhibit A.  I cannot reconcile the plain text of the Agreement's statements that Holzbaur contributed cash with its statement that his membership was in exchange for sweat equity.[79]  "[W]here a contract contains two conflicting provisions, the document is rendered

---

[76] Agr. § 3.1.

[77] *Id.* § 9.20.

[78] *Sweat Equity*, Black's Law Dictionary (12th ed. 2024).

[79] It is tempting to view Section 9.20 as more specific than, and controlling over, Section 3.1 and Exhibit A.  *See Sunline*, 206 A.3d at 846.  Section 9.20 speaks more specifically to the rationale for the Company's membership structure, and its formatting and syntax suggest Section 9.20 was written specifically for the Company.  Section 3.1 looks more like boilerplate, and Exhibit A is unrealistic given the costs of starting a restaurant.  But that exercise risks diverging from the Agreement's plain text, and renders Section 3.1 and Exhibit A surplusage.  Both are improper.  *See Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010); *Seidensticker*, 2007 WL 4054473, at *2.

14

ambiguous."[80]  I look to extrinsic evidence to resolve the ambiguity.

"[E]xtrinsic evidence is an appropriate resource for the court to use in determining the parties' reasonable intentions at the time of the contract."[81]  "Such extrinsic evidence may include 'overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry.'"[82]  And

> [a]lthough contemporaneous evidence is far more probative of the shared expectations of contracting parties as a general matter, that does not mean that a party's subsequent conduct has no probative value. Indeed, this Court has stated that, "[i]n giving effect to the parties' intentions, it is generally accepted that the parties' conduct before any controversy has arisen is given 'great weight.'"[83]

The extrinsic evidence is overwhelmingly in Defendants' favor.  Holzbaur and Sugrue met multiple times before the Company was formed to discuss the business, including its membership structure.[84]  In those meetings, Holzbaur and Sugrue

---

[80] *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *12 (Del. Ch. Dec. 7, 2012); *see also Sunline*, 206 A.3d at 839–40 ("[T]he Term Agreement does contain conceivably conflicting terms, which cannot be indisputably reconciled on the face of the contract, and is therefore ambiguous."); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 836 (Del. Ch. 2007) (explaining that because the "Merger Agreement simultaneously purports to provide and preclude the remedy of specific performance" those "conflicting provisions of th[at] contract render it decidedly ambiguous").

[81] *Dittrick*, 948 A.2d at 406.

[82] *United Rentals*, 937 A.2d at 834–35 ((alternation in original) quoting *Supermex Trading Co. v. Strategic Sols. Gp. Inc.*, 1998 WL 229530, at *3 (Del. Ch. May 1, 1998)).

[83] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *24 (Del. Ch. Mar. 15, 2017) (quoting *Ostroff*, 2007 WL 121404, at *11).

[84] *E.g.*, Holzbaur Tr. 10, 15; Monaco Tr. 54; Sugrue Tr. 79.

agreed Holzbaur would contribute sweat equity. Holzbaur knew what sweat equity meant: he "understood [i]t to be a contribution of labor in exchange for equity in the business."[85]

For one of these discussions, Sugrue met with Holzbaur and Monaco at a coffee shop to make "sure everyone understood what the circumstances were."[86] The three explicitly discussed cash contributions. Everyone understood that only Sugrue and Stafman would contribute cash. Monaco, who was situated similarly to Holzbaur, understood she was a sweat equity member too.[87] No party intended that Holzbaur would be a cash contributing member. [88]

Evidence of the Agreement's drafting also demonstrates the parties did not intend Holzbaur to be a cash contributing member. Sugrue drafted Section 9.20 to

---

[85] Holzbaur Tr. 20.

[86] Sugrue Tr. 79.

[87] Monaco Tr. 59.

[88] Holzbaur argues that Sugrue, Monaco and Holzbaur never discussed any expectation that Holzbaur would be a noncash equity partner. PTRB at 2–3. In a technical sense, Holzbaur is correct; Monaco testified that they never discussed whether she and Holzbaur would be treated as cash equity partners. Monaco Tr. 58–59. But the evidence shows all parties knew and agreed that Holzbaur and Monaco would not contribute cash to the business. *See, e.g.*, Holzbaur Tr. 21 ("'Q. Okay. And did you and [Sugrue] have a discussion between the discussion to close [Sugrue's old restaurant] and you seeing that email with those three pages [in the Agreement] about sweat equity?' 'A. Yes.' 'Q. What was the discussion?' 'A. As I remember it, the sweat equity was going to be my contribution in and that being opening the restaurant, getting it open, and then running it. That was going to be my sweat equity contribution in order to become a partner for the restaurant.'"); Monaco Tr. 54–55, 65–66.

16

capture the parties' understanding of the Company's membership structure and the reasons behind it.[89] He took Exhibit A from another agreement and changed it to reflect the ownership percentages, inserting symbolic cash contributions to correlate with that percentage.[90] Section 9.20 reflects the parties' intended contributions, not Exhibit A and Section 3.1.

And the parties performed as they had agreed. Sugrue and Stafman put up cash for the business; Holzbaur did not. And Sugrue and Stafman contributed much more than the $100 listed in Exhibit A. Holzbaur worked as the Restaurant's general manager for six years and never contributed cash, even when he was given the opportunity a few years in.[91] Holzbaur received distributions only after the cash contributing members were repaid.[92]

The extrinsic evidence shows the parties agreed that Holzbaur was a noncash contributing member. It follows he was properly removed by Sugrue: the parties do not dispute that outcome. He is no longer a member of the Company, and is owed no distributions.

## B.  *Contra Proferentem* Is Not Appropriate Here.

Holzbaur invited this Court to construe the ambiguous Agreement against

---

[89] Sugrue Tr. 79–88.

[90] *Id*. 86–88.

[91] *Id.* 83–84.

[92] Agr. § 9.20; Sugrue Tr. 81–82; Holzbaur Tr. 38.

Sugrue as the drafter. This principle is known as *contra proferentem*.[93] I do not accept Holzbaur's invitation.

*Contra proferentem* is a principle of "last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction."[94] And it is most often applied to contracts of adhesion,[95] like insurance agreements[96] or contracts involving public investors.[97] "Where a[n] [LLC] agreement was drafted exclusively by the [manager], the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence. But if a[n] [LLC] agreement was the product of negotiations among the parties, the court will resolve an ambiguity by examining relevant extrinsic evidence."[98] As explained by the Supreme Court in *SI Management L.P. v. Wininger*,

> A court considering extrinsic evidence assumes that there is some connection between the expectations of contracting parties revealed by that evidence and the way contract terms were articulated by those parties. Therefore, unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to

---

[93] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003).

[94] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985).

[95] *Cont'l Ins. Co. v. Burr*, 706 A.2d 499, 500–01 (Del. 1998); *see also Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 548 (Del. Ch.), *aff'd*, 314 A.3d 685 (Del. 2024) (TABLE); 11 Williston on Contracts § 32:12 (4th ed.).

[96] *E.g.*, *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149–50 (Del. 1997).

[97] *E.g.*, *Bank of N.Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 551–52 (Del. 2013).

[98] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *8 (Del. Ch. Sept. 27, 2000).

interpret contractual language. Thus, it is proper to consider extrinsic evidence of bilateral negotiations when there is an ambiguous contract that was the product of those negotiations . . . .[99]

At first blush, the use of *contra proferentem* has some appeal. Sugrue held the pen; he drafted the Company's agreement as its manager; and there were no redlines back and forth marking up and negotiating the agreement, nor was any counsel involved. But the Agreement reflected a meeting of the minds between Sugrue and Holzbaur regarding Holzbaur's contribution and membership. Sugrue and Holzbaur, alone and with Monaco, discussed and agreed upon the nature of Holzbaur's membership interest before Sugrue sent the Agreement to Holzbaur. Sugrue, Holzbaur, and Monaco discussed their positions and whether they would contribute cash or sweat equity. And Holzbaur "assum[ed] that there would be a written agreement" about what was discussed.[100] While not every detail of the Agreement was discussed or negotiated at these meetings, the Agreement is not a contract of adhesion, and this is not a situation where extrinsic evidence is an "incomplete guide."[101] The extrinsic evidence speaks to the intent of both Sugrue and Holzbaur, and "[w]here all parties to a contract are knowledgeable, there is no reason for imposing sanctions against the party who drafted the final provision."[102]

---

[99] *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998).

[100] Holzbaur Tr. 14–15.

[101] *Wininger*, 707 A.2d at 43.

[102] *E.I. du Pont de Nemours*, 498 A.2d at 1114.

*Contra proferentem* is not appropriate.

### III.  **CONCLUSION**[103]

Holzbaur is not a member of the Company.  He is owed no further distributions.  Judgment will be entered in Defendants' favor, and costs shifted under Court of Chancery Rule 54(d).  The parties are asked to submit a stipulated final order within fourteen (14) days.

---

[103] In the PTO, Defendants requested attorneys' fees from Holzbaur.  PTO at 7.  Defendants did not brief this request.  I consider it waived.  *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").  Nor can I discern any reason to deviate from the American Rule and shift fees.  There is no feeshifting provision in the Agreement, and Defendants have not gone so far as to argue bad faith by Holzbaur.