# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| 8908 KANIS REMAINCO LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0901-KSJM |
| | ) | |
| GASTROENTEROLOGY AND | ) | |
| SURGERY CENTER OF ARKANSAS, | ) | |
| P.A. and ALONZO WILLIAMS, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GASTROENTEROLOGY AND | ) | |
| SURGERY CENTER OF ARKANSAS | ) | |
| II, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: February 25, 2026
Date Decided: April 15, 2026

Stephen C. Norman, Samuel G. Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Plaintiff 8908 Kanis RemainCo LLC.*

David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; Jess Askew III, KUTAK ROCK LLP, Little Rock, Arkansas; *Counsel for Defendants Gastroenterology and Surgery Center of Arkansas, P.A. and Alonzo Williams.*

**McCORMICK, C.**

The nominal defendant's LLC agreement establishes eligibility criteria for membership and management. The plaintiff filed suit seeking declaratory judgments that the entity defendant does not meet the criteria to be a member and the individual defendant does not meet the criteria to be a manager. The defendants concede that they do not meet the eligibility criteria. But they interpret the LLC agreement to provide a single mechanism for divesting a member of its interests—an option to buy out the entity defendant upon its loss of eligibility. They argue that the option is waivable. They say that the plaintiff waived it here. And as a result, both defendants are able to maintain their posts. The defendants also raise a host of affirmative defenses, arguing that the plaintiff's own actions in managing the nominal defendant bar its claims for relief. This post-trial decision finds that the defendants' failure to meet eligibility requirements means that defendants lost their member status and managerial rights. The entity defendant, however, maintains its economic interests in the nominal defendant. Judgment is entered for the plaintiff.

## I.    FACTUAL BACKGROUND

The court held trial on a paper record on February 11, 2026. The record comprises 65 trial exhibits. These are the facts as the court finds them after trial.[1]

---

[1] This decision cites to: C.A. No. 2025-0901-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkt. 45 ("Trial Tr."); and stipulated facts set forth in the Joint Pre-Trial Stipulation and Order, Dkt. 40 ("PTO"). The parties called the following witnesses by deposition: Mark Roberts (8908 Kanis RemainCo Chief Restructuring Officer) and Alonzo Williams (GSC Owner and Former Surgery Center Medical Director). The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr."

## A. Williams Forms The Surgery Center.

Defendant Alonzo Williams is a gastroenterologist based in Arkansas.[2] On March 1, 2009, Williams formed Gastroenterology and Surgery Center of Arkansas II, LLC (the "Surgery Center" or the "Company") for the purpose of "own[ing] and operat[ing] an ambulatory surgery center in the Little Rock, Arkansas area, providing gastrointestinal procedures and other related medical services to outpatients[.]"[3] Williams contributed "substantially all of the assets" of his pre-existing surgical center to the Company at the time of formation.[4]

The Company is governed by a Limited Liability Company Agreement (the "LLC Agreement") also dated March 1, 2009.[5]

The LLC Agreement creates two classes of membership interests—"Class A Units," making up 49% of the Company's membership interests, and "Class B Units," making up 51%.[6] Class B is intended for an investor-operator to run the Company's non-medical operations.[7] Class B Units may be freely transferred to any affiliate of an existing Class B Member.[8]

---

[2] PTO ¶ 5.

[3] PTO ¶ 8; JX-1 (LLC Agreement) at 1.

[4] LLC Agreement at 1.

[5] *Id.*

[6] PTO ¶ 9; LLC Agreement § 1.1 (defining "Unit"); *id.*, Schedule A.

[7] Williams Dep. Tr. at 170:21–171:6.

[8] LLC Agreement § 1.1 (defining "Permitted Transfer").

Class A is intended for doctors who provide medical services at the Company's facility in Little Rock.[9] To that end, Class A unitholders, or "Class A Members,"[10] must meet the "Class A Eligibility Criteria."[11] The Class A Eligibility Criteria include the "Physician Eligibility Criteria," and the two provisions together require that each Class A Member is (or is wholly owned by) a physician that is licensed in Arkansas and is engaged full-time at the Surgery Center.[12] Section 7.16 of the LLC Agreement (the "Annual-Certification Requirement") requires that Class A Members certify in writing each year that they satisfy the Physician Eligibility Criteria.[13]

Gastroenterology and Surgery Center of Arkansas, P.A. ("GSC"), an Arkansas professional association owned and controlled by Williams, was initially the sole member of the Company and held all of the member interests in the Surgery Center.[14] Concurrent with the formation of the Company, GSC transferred Class A Units to three other physicians.[15] GSC retained a majority of the Class A Units.[16] GSC

---

[9] Williams Dep. Tr. at 170:9–15.

[10] LLC Agreement § 1.1 (defining "Class A Manager," "Class A Member," and "Member").

[11] PTO ¶ 10; LLC Agreement § 1.1 (defining "Class A Eligibility Criteria").

[12] PTO ¶ 11; LLC Agreement § 1.1 (defining "Physician Eligibility Criteria"). This decision quotes the definitions in full in the Legal Analysis.

[13] LLC Agreement § 7.16.

[14] PTO ¶ 6; LLC Agreement at 1.

[15] LLC Agreement, Schedule A at A-1; JX-2 at 1.

[16] LLC Agreement, Schedule A at A-1.

3

transferred all of the Class B Units to Covenant Surgical Partners, Inc. ("Covenant"), which was admitted as the sole Class B Member.[17]

Section 8.2 of the LLC Agreement provides that Class A Members shall appoint two "Class A Managers" to a four-person "Board."[18] "Class B Members" shall appoint two "Class B Managers."[19] Managers hold office until a subsequent annual meeting, or until a Manager's successor "is elected and qualified or until his earlier death, resignation or removal."[20]

Williams has served as a Class A Manager of the Surgery Center since 2009.[21] He also served as Medical Director of the Company pursuant to a Medical Director Services Agreement.[22] Covenant managed the Company pursuant to a Management Agreement.[23] The LLC Agreement permits the Board to delegate authority under a management agreement. The Board did so under the Management Agreement, which gave Covenant authority over the day-to-day operations of the Company.[24]

---

[17] *Id.*

[18] LLC Agreement § 1.1 (defining "Class A Manager," "Class A Member," and "Member"); *id.* § 8.2; PTO ¶ 12.

[19] LLC Agreement § 8.2; PTO ¶ 12.

[20] LLC Agreement § 8.2.

[21] PTO ¶ 5.

[22] *Id.* ¶ 15.

[23] JX-4 (Mgmt. Agreement).

[24] *Id.*; LLC Agreement § 8.1.

Section 12.3.1 of the LLC Agreement (the "Option Provision") provides Class A Members with a call option for the Class A Units of other Class A Members.[25] If a Class A Member goes bankrupt, makes an assignment for the benefit of creditors, is subject to a receivership or trust, violates noncompetition provisions, fails to satisfy the Annual-Certification Requirement or otherwise fails to satisfy the Class A Eligibility Criteria, the other Class A Members have the "right, but not the obligation" to purchase the Class A units owned by that Member.[26] If the other Class A Members do not exercise the option, the option passes to the Company.[27] The Class A Members' option expires 30 days after the Company gives them notice.[28] The Company's option expires 30 days after the Class A Members' option expires.[29] The Option Provision also lays out a formula to calculate the option's exercise price.[30]

**B.  Williams Buys McGee Out Of The Surgery Center.**

Over time, Class A Members left the Surgery Center. And according to Williams, physicians that left the Surgery Center still retained an equity position in the Company until they were bought out or transferred their interests to another physician.[31] By 2023, GSC and an entity owned by Dr. Brian McGee were the only

---

[25] PTO ¶ 14.

[26] LLC Agreement § 12.3.1.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Williams Dep. Tr. at 185:24–186:15.

5

two remaining Class A Members.[32] McGee relinquished his privileges on August 25, 2023 following Williams's decision not to renew McGee's employment contract.[33]

As McGee was no longer employed at the Surgery Center, he failed to satisfy the Physician Eligibility Criteria.[34] Williams, as the only other Class A Member, sought to exercise his option to buy McGee's Class A Units. McGee initially objected, stating through counsel that there was no "meeting of the minds" as to the exercise price.[35] Williams, through counsel, responded that McGee's "failure to satisfy the Physician Eligibility Criteria" triggered Williams's option subject to the exercise-price formula in the Option Provision, and that no additional "meeting of the minds" on price was necessary.[36] The parties ultimately agreed that Williams, through GSC, would purchase McGee's Class A Units using the exercise-price formula in the Option Provision.[37] Covenant assisted in calculating the exercise price.[38]

### C. Williams's Misconduct Comes To Light.

From August 2023 through March 2024, the Arkansas State Medical Board (the "Medical Board") received numerous complaints about Williams.[39] The complaints, including one filed by a former Surgery Center employee (the "Former

---

[32] PTO ¶ 16.

[33] *Id.* ¶ 18; JX-6; JX-7.

[34] JX-8 at 2.

[35] JX-8 at 4.

[36] *Id.* at 2.

[37] PTO ¶ 19; JX-47.

[38] JX-8 at 2.

[39] JX-20 at 4.

Employee"), alleged that "Williams engaged in inappropriate sexual conduct with an employee, engaged in inappropriate prescribing, and performed numerous inappropriate medical procedures."[40] On October 5, 2023, the Arkansas State Medical Board initiated its investigation into Williams.[41] On March 5, 2024, counsel for the Former Employee contacted a regulatory manager for the Medical Board,[42] submitting a declaration from the Former Employee recounting appalling allegations of Williams's sexual misconduct and inappropriate medical practices.[43]

Six days later, the Arkansas Office of Medicaid Inspector General issued a letter to Williams and the Company stating that "there is a credible allegation of fraud, including but not limited to allegations that [Williams] performed certain procedures that were not medically necessary, failed to adequately assess certain beneficiaries before invasive procedures, and billed for services not rendered."[44] As a result, the Inspector General suspended all Medicaid payments to the Company for services performed by Williams.[45] To date, the Inspector General has not lifted its suspension of Medicaid payments pending the results of a full investigation.[46]

---

[40] *Id.*; JX-9 at 1.

[41] JX-20 at 4; JX-34 at 3.

[42] *See* JX-20 at 1.

[43] JX-9 at 2–12.

[44] JX-10 at 1.

[45] *Id.*; Williams Dep. Tr. at 133:9–11 (agreeing that the provider referenced in the Inspector General's letter was Williams).

[46] Williams Dep. Tr. at 135:4–9.

7

On March 22, 2024, Covenant learned of the Former Employee's allegations against Williams. The Former Employee's counsel contacted Covenant's counsel and described the Medical Board's investigation and the Former Employee's declaration.[47] At his deposition, Williams admitted to certain allegations leveled by the Former Employee, including having a sexual relationship with the Former Employee while he was serving as the Surgery Center's medical director.[48] Williams also confirmed that he paid employees "cash bonuses" if they could schedule "at least 90 procedures in three days."[49]

### D. Covenant Transfers Its Class B Units To Plaintiff And Scrambles To Wind Down The Surgery Center.

Around the time it learned of Williams's alleged misconduct and related investigations, Covenant had been negotiating a deal whereby United Surgical Partners International would acquire a controlling stake in Covenant.[50] On March 23, the day after Covenant learned of the Former Employee's declaration, Covenant and United Surgical Partners agreed to a closing condition requiring Covenant to divest its membership interests in the Surgery Center before United Surgical Partners' acquisition.[51]

---

[47] JX-55.

[48] Williams Dep. Tr. at 141:8–11, 65:15–17.

[49] *Id.* at 142:20–143:2.

[50] JX-62 ¶¶ 3–5.

[51] *Id.* ¶¶ 5–6.

Covenant worked quickly to distance itself from the Surgery Center. On March 28, Covenant shut down the Surgery Center's operations and terminated its Management Agreement with the Surgery Center.[52] The next day, Covenant transferred its 51% interest in the Company to 8908 Kanis RemainCo LLC ("Plaintiff") under an Interest Purchase Agreement, and the United Surgical Partners acquisition closed.[53] But in its haste, Covenant never sought to amend the LLC Agreement to reflect Plaintiff's admission as a Member.[54] Nor did Plaintiff appoint any Class B Managers.[55]

In May 2024, Plaintiff engaged consulting firm Alvarez & Marsal and appointed Alvarez & Marsal partner Mark Roberts to serve as Plaintiff's Chief Restructuring Officer.[56] Roberts began negotiating and executing severance agreements with Surgery Center employees.[57]

In late July and early August 2024, counsel for Covenant and Plaintiff contacted counsel for Williams requesting that Williams authorize Alvarez & Marsal to act on behalf of the Surgery Center.[58] Williams then learned about Plaintiff's ownership of Class B Units for the first time.[59]

---

[52] JX-11; PTO ¶ 26.

[53] JX-12; JX-62 ¶ 3; JX-59 at 2.

[54] PTO ¶ 28.

[55] *Id.* ¶ 27.

[56] JX-43 at 4–5; Roberts Dep. Tr. at 22:8–23:24.

[57] Roberts Dep. Tr. at 20:19–21:8; *see, e.g.*, JX-57.

[58] JX-59 at 1–2.

[59] *Id.*

### E. Williams's Medical License Is Revoked.

Also in August 2024, the Medical Board held a two-day disciplinary hearing on Williams's alleged misconduct.[60]  On August 13, 2024, the Medical Board issued its "Findings of Fact, Conclusions of Law, and Order."[61]  The Medical Board found that Williams was running a "pill mill" for opioids and endangered patients with unnecessary medical procedures.  For example, the Medical Board found:

- "Patient records of [Williams] show repeated [colonoscopies, negative biopsies, and esophagogastroduodenoscopies ("EDG")] . . . . The pattern of practice . . . displays *gross overutilization with unnecessary risk of harm*."[62]

- "Patient K.T.'s medical records also show troublesome prescribing by Dr. Williams.  K.T. was fired from Williams's clinic in March 2022 after a confrontation about diversion with pharmacies.  By early 2023, K.T. had been tapered down to [a prescription of 15 lorazepam pills, each at 0.5 milligrams] by pain doctors.  *When K.T. returned to Dr. Williams in March 2023, K.T. immediately received two [] separate prescriptions [of 60 and 30 lorazepam pills, each at 2 milligrams] written one [] day apart.*  This pattern of prescribing *two [] controlled prescriptions a few days* apart was repeated in July 2023 . . . . In March 2023 and in July 2023, one [] prescription was filed on insurance and one [] was purchased with another source of payment."[63]

- "Dr. Williams performed *approximately 97 EGD procedures on patient L.B. during a ten [] year period.*  All the 97 EGD procedures were performed with a corresponding esophageal dilation procedure."[64]

---

[60] JX-20 at 4.

[61] *Id.* at 15.

[62] JX-20 at 6 (emphasis added).

[63] *Id.* (emphasis added).

[64] *Id.* at 8 (emphasis added).

- "Dr. Williams performed in excess of *120 biopsies of A.L. over a ten []  year period.*"[65]

On August 13, the Medical Board revoked Williams's medical license, among other sanctions.[66] Williams filed an appeal in September 2024, and a trial was held on April 15, 2026.[67]

### F.  Plaintiff Continues To Wind Down The Surgery Center.

In October 2024, as part of efforts to wind down the Company, Plaintiff requested that Williams sign a written consent granting Roberts limited power of attorney to act on the Surgery Center's behalf to pay vendor invoices, terminate vendor contracts, and file the Surgery Center's tax returns (the "October 2024 Written Consent").[68] The October 2024 Written Consent also sought to appoint Roberts as Class B Manager and ratify any actions Roberts took on the Surgery Center's behalf prior to his appointment.[69] The October 2024 Written Consent described Williams as a Class A Manager and as acting on behalf of GSC, the sole Class A Member.[70] But Williams never signed the agreement.[71]

---

[65] *Id.* (emphasis added).

[66] *Id.* at 14–15.

[67] JX-21 at 1; JX-45 at 1.

[68] JX-24 at 1–2.

[69] *Id.* at 2.

[70] *Id.*

[71] *See* JX-25 at 1.

## G. Williams Fails To Re-Certify And Plaintiff Files This Litigation.

Having had his medical license revoked, Williams failed to certify that he met the LLC Agreement's Physician Eligibility Criteria on April 1, 2025.[72] That same month, the City of Little Rock served a notice of business license delinquency on the Surgery Center.[73] But Plaintiff had still not received Williams's consent to complete the Surgery Center's wind-down.

On June 5, 2025, Plaintiff sent a letter to Williams expressing frustration that "[Plaintiff] has sought [Williams's] cooperation to address operational requirements and corporate wind down of" the Surgery Center, but Williams "has refused to appoint an officer of [the Surgery Center] or even grant someone limited power of attorney to facilitate the payment of outstanding [Company] invoices . . . and relinquish applicable licenses and permits."[74] The letter attached a written consent (the "June 5 Written Consent") for Williams's signature.[75] And the letter warned that if Williams did not sign the written consent in four days, Plaintiff would begin to take action on behalf of the Surgery Center to wind down operations, including relinquishing permits, settling invoices, terminating contracts, liquidating equipment, engaging a patient-record custodian, and filing for dissolution.[76]

---

[72] PTO ¶ 32.

[73] JX-27 at 2.

[74] JX-31 at 1.

[75] JX-32.

[76] JX-31 at 1–2.

12

Williams again did not sign the Written Consent. One month later, Plaintiff filed this action against Williams and GSC ("Defendants"). In its complaint, Plaintiff alleges deadlock and seeks expedited declaratory relief under 6 *Del. C.* §§ 18-110–11 determining that GSC is not a Class A Member of the Surgery Center and that Williams is not a Class A Manager of the Surgery Center.[77] Defendants answered the complaint in September 2025 and the parties agreed to an expedited schedule in October 2025.[78] The court held a one-day trial on the papers on February 11, 2026.[79]

## II. LEGAL ANALYSIS

Plaintiff seeks a declaratory judgment that because GSC cannot satisfy the Class A Eligibility Criteria, GSC is no longer a Class A Member and Williams is no longer a Class A Manager.[80] Defendants dispute Plaintiff's contractual interpretation and raise affirmative defenses. Plaintiff bears the burden of proving its claim, and Defendants bear the burden of proving the affirmative defenses, by a preponderance of the evidence.[81]

---

[77] Dkt. 1 at 13, 15–17.

[78] Dkts. 9, 16.

[79] Dkt. 43.

[80] Dkt. 29 ("Pl.'s Pre-Trial Opening Br.") at 17–20.

[81] *Lillis v. AT & T Corp.*, 2008 WL 2811153, at *4 (Del. Ch. July 21, 2008), *aff'd sub nom. AT&T Corp. v. Lillis*, 970 A.2d 166 (Del. 2009); *Lighthouse Behav. Health Sols., LLC v. Milestone Addiction Counseling, LLC*, 2023 WL 3486671, at *9 (Del. Ch. May 17, 2023).

13

### A.    Contract Dispute

The court's task is to interpret the LLC Agreement in a way that carries out the parties' intent.[82]  Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[83]  The **contract** terms will be given "plain, ordinary meaning."[84]  "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[85]  The court must "reconcile all the provisions of the instrument" if possible.[86]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[87]  "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[88]  "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have

---

[82] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[83] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[84] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[85] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[86] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[87] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[88] *Id.* (citing *Osborn*, 991 A.2d at 1160).

14

accepted when entering the contract.'"[89] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[90] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[91] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[92]

### 1. Plaintiff's Position

Plaintiff's contract claim relies on the Class A Eligibility Criteria, the Physician Eligibility Criteria, and the Annual-Certification Requirement (the "Class A Eligibility Provisions").

The Class A Eligibility Criteria requires that Class A Members:

> be either (i) a Physician that meets the Physician Eligibility Criteria; (ii) an entity all the Equity Interests in which are owned by Physicians who meet the Physician Eligibility Criteria; or (iii) an entity that satisfies the definition of group practice set forth in 42 CFR, Section 1001.952(p) and is not a Sanctioned Entity.[93]

In essence, the Class A Members must be physicians, or must be wholly owned by physicians, that meet the Physician Eligibility Criteria.

The Physician Eligibility Criteria requires that physicians:

---

[89] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[90] *Id.*

[91] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

[92] *Salamone*, 106 A.3d at 374 (citation omitted).

[93] LLC Agreement § 1.1.

15

(i) . . . are licensed to practice medicine in the State of Arkansas; (ii) be on the active staff of the Surgery Center and continuously meet the credentialing requirements established by the medical staff at the Surgery Center[.]"[94]

The above requirements are conjunctive. Physicians must be licensed, on the active staff of the Surgery Center, and continuously credentialed.

The Annual-Certification Requirement requires that Class A Members:

[o]n or before April 1st of each year, . . . certify annually to the Company in writing, with respect to the prior Fiscal Year as applicable: (i) that each Class A Member that is a Physician satisfies the Physician Eligibility Criteria, or (ii) (a) that each Class A Member that is not a Physician satisfies the Class A Member Eligibility Criteria, [and] (b) that the organizational or applicable governing documents of such Class A Member contain provisions obligating the Class A Member to redeem all of the Equity Interests owned by any of its equity owners that fail to satisfy the Physician Eligibility Criteria[.][95]

Taken together, the Class A Eligibility Provisions require that Class A Members be physicians, or entities wholly owned by physicians, licensed to practice medicine in Arkansas, on the active staff at the Surgery Center, and current in their credentials. And if the Class A Member is an entity, then it must be able to remove equity owners that are not appropriately credentialed physicians. Class A Managers are Class A Members or owners of Class A Members, which can only be physicians.[96]

Plaintiff's argument is straightforward: Williams is no longer licensed to practice medicine in Arkansas, and he therefore does not satisfy the Physician

---

[94] *Id.*

[95] LLC Agreement § 7.16.

[96] *Id.* § 8.2.

Eligibility Criteria. Thus, GSC, who was previously a Class A Member, is no longer wholly owned by a physician meeting the Physician Eligibility Criteria, which is a requirement under the Class A Eligibility Criteria. So, GSC is no longer a Class A Member.[97] And because GSC is no longer a Class A Member, Williams is no longer a Class A Manager.

### 2. Defendants' Position

Defendants do not dispute that they no longer satisfy the Class A Eligibility Provisions. But they argue that Williams's failure to satisfy the Physician Eligibility Criteria does not automatically result in GSC's removal as a Class A Member nor Williams's removal as a Class A Manager.[98] According to Defendants, the LLC Agreement sets forth a single and discretionary process for removing a noncompliant Class A Member: the Option Provision.[99]

The Option Provision states:

> Upon the occurrence of any of the following events with respect to a Class A Member (the "Call Option Member"), the Class A Members other than the Call Option Member (the "Member Option Holders") and then the Company shall have the right (as set forth in this Section 12.3.1), but not the obligation, subject to Section 12.12 hereof, to purchase the Class A Units owned by the Call Option Member: . . .[100]

---

[97] Pl.'s Pre-Trial Opening Br. at 17–20.

[98] Dkt. 32 ("Defs.' Pre-Trial Answering Br.") at 15.

[99] *Id.* at 16–19.

[100] LLC Agreement § 12.3.1.

One of the "occurrences" of non-compliance triggering the option relates the Class A Eligibility Provisions:

> if the Call Option Member or any Person owning an Equity Interest cannot satisfy the certification requirements in Section 7.16 or otherwise fails to satisfy the Class A Member Eligibility Criteria.[101]

The Option Provision states that once the Company learns of a Class A Member's noncompliance, it must: "notify the Member Option Holders in writing of the occurrence of the event and the Member Option Holders' right . . . (the 'Section 12.3.1 Notice')."[102] The Member Option Holders have 30 days from the Section 12.3.1 Notice to "give written notice" to the noncompliant Class A Member of their exercise of the option.[103] If the Member Option Holders do not give notice within 30 days, "the right of the Member Option Holders under this Section 12.3.1 shall expire as to the particular event that gave rise to such right, and the Company shall have the right, but not the obligation, to purchase the Class A Units[.]"[104]

Putting it together, if a Class A Member fails to satisfy the Class A Member Eligibility Provisions, the other Class A Members and then the Company have the option to purchase the Class A Units owned by the noncompliant Member. To exercise the option, the Company must first notify the option holders of the event of noncompliance. The option holders must then send a notice of their intention to

---

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

18

exercise the option within thirty days of being notified of the event of noncompliance. If the option holders do not provide timely notice or do not exercise the option, the option holders may not exercise the option based on that event of noncompliance.

Defendants argue that the Option Provision is the exclusive mechanism for removing a noncompliant Class A Member. The LLC Agreement does not state this expressly. But according to Defendants, if a Class A Member could be removed automatically by failing to satisfy the Class A Eligibility Criteria, then the Option Provision would be meaningless and there would be no reason to create an option to purchase the Class A Units of a noncompliant Member.[105]

Further, because the Option Provision creates an option that can expire, Defendants argue the LLC Agreement contemplates a scenario where a noncompliant Class A Member can remain a Class A Member if neither the Member Option Holders nor the Company exercises the option.[106] Here, there are no Class A Members other than GSC, and Plaintiff declined to exercise the option on behalf of the Company despite knowing GSC failed to satisfy the Physician Eligibility Criteria on April 1, 2025. Thus, Defendants say, the option expired with respect to GSC's failure to satisfy the Physician Eligibility Criteria in 2025.[107]

---

[105] Defs.' Pre-Trial Answering Br. at 19 (citing, inter alia, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (stating that the court must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage.")).

[106] Defs.' Pre-Trial Answering Br. at 20.

[107] *Id.* at 18–19.

19

Plaintiff does not dispute that the Option Provision is the only mechanism by which it may buy out GSC's economic interests in the Company. But Delaware law recognizes a distinction in the LLC context between management and economic rights. "Economic interests in limited liability companies may be owned by persons who are not members."[108] For example, 6 *Del. C.* 18-702(b) provides that being assigned economic units in an LLC affords the unitholder economic rights only; the unitholder is not entitled to exercise the rights or powers of a member unless otherwise provided in the operating agreement.[109] The inverse can also be true: in the case of the bankruptcy of a unitholder, 6 *Del. C.* 18-304 revokes that unitholder's right to participate in management, but the unitholder retains her economic interest in the LLC.[110] An operating agreement, like the LLC Act, may thus revoke membership status while permitting the unitholder to retain economic interests.

Plaintiff argues that Defendants' interpretation conflates managerial and economic rights. According to Plaintiff, no one intended and the LLC Agreement does not require that a noncompliant member have managerial rights.[111] And if a

---

[108] *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *2 n.27 (Del. Ch. Sept. 2, 2008) (citing Robert K. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 1.04[C][2], at 1–20 (2007 ed.)).

[109] *See Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *21 (Del. Ch. Oct. 28, 2022), *judgment entered sub nom. Riverside Risk Advisors LLC v. Ching Chao* (Del. Ch. 2023), *and aff'd*, 303 A.3d 51 (Del. 2023); *Mack Bros. v. Keypoint Intel., LLC*, 2025 WL 3041804, at *12–14 (Del. Ch. Oct. 29, 2025).

[110] 6 *Del. C.* 18-304; *Zachman v. Real Time Cloud Servs. LLC*, 251 A.3d 115, 2021 WL 1561430, at *3 (Del. 2021) (TABLE).

[111] Dkt. 35 ("Pl.'s Pre-Trial Reply Br.") at 5–7.

noncompliant Class A Member could retain membership rights after the option right expires, the LLC Agreement's requirement that Class A Members must be "active" on the Surgery Center's staff and must "continuously" meet the Class A Eligibility Criteria would have little meaning.

### 3. Resolving Contractual Ambiguity

Each side's interpretation of the parties' contractual scheme governing noncompliant members is reasonable. The LLC Agreement is thus ambiguous as to the parties' contract dispute. The court may therefore consider extrinsic evidence to discern the parties' intent, including "the history of negotiations, earlier drafts of the contract, trade custom, or course of performance."[112]

Plaintiff relies on Williams's deposition testimony that Class A was intended for "physicians that were going to provide the medical services at the Surgery Center."[113] Plaintiff argues that his testimony serves as evidence of the parties' intent to limit Class A membership and managerial rights to those satisfying the Physician Eligibility Criteria.[114]

Defendants point to the parties' course of performance. GSC purchased McGee's Class A Units after McGee became noncompliant when he relinquished his privileges at the Surgery Center.[115] They say Plaintiff's predecessor Covenant

---

[112] *In re Westech Cap. Corp.,* 2014 WL 2211612, at *9 (Del. Ch. May 29, 2014), *rev'd in part on other grounds*, *Salamone v. Gorman*, 106 A.3d 354 (Del. 2014).

[113] Williams Dep. Tr. at 170:9–15.

[114] Pl.'s Pre-Trial Opening Br. at 5.

[115] JX-8 at 2; PTO ¶ 19; JX-47.

21

assisted GSC in calculating the exercise price under the Option Provision, suggesting Plaintiff recognizes the Option Provision's valid application to noncompliant Class A unitholders.[116]

Neither party made a robust showing of extrinsic evidence. But Plaintiff has at least demonstrated by a preponderance of the evidence that the contracting parties intended to ensure that only licensed physicians active at the Surgery Center be involved in the management of the Company.

The parties' course of performance does not contradict this conclusion. Rather, Plaintiff's and GSC's involvement in buying out McGee's Class A Units demonstrates only that Class A unitholders' equity positions remain intact when they become noncompliant. Williams described this practice at his deposition, and Plaintiff does not dispute it.[117]

Nor does the parties' course of performance suggest that the Option Provision is the only way to extinguish a Class A unitholder's status and managerial rights. The fact that Williams exercised an option against McGee does not address what would have happened if McGee continued to assert managerial rights at the Company. Williams's buyout of McGee under the Option Provision suggests only that

---

[116] JX-8 at 2. Defendants also argue that Plaintiff acknowledged GSC's Class A Membership and Williams's status as Class A Manager when it sent Williams the June 5 Written Consent, and thus waived any argument to the contrary. Defs.' Pre-Trial Answering Br. at 20–22, 27. But the June 5 Written Consent states only that GSC "holds all of the Class A Units of the Company" and does not address whether GSC is a Class A Member or whether Williams is a Class A Manager. JX-32 at 1.

[117] Williams Dep. Tr. at 185:24–191:10.

McGee, though failing to meet the Class A Eligibility Criteria, retained economic rights in the Surgery Center.

Because Plaintiff has proven by a preponderance of the evidence that the LLC Agreement intended to limit managerial rights to Class A unitholders who are licensed physicians and providing medical services at the Company, the Class A Eligibility Provisions are a basis to revoke the status and managerial rights previously afforded to GSC and Williams.

## B. Affirmative Defenses

Based on a smattering of factual assertions, Defendants raise a series of affirmative defenses to Plaintiff's claims: prior breach, unclean hands, acquiescence, waiver, ratification, and estoppel.[118] But none of Defendants' arguments work.

Defendants point out that Plaintiff, as a Class B Member, never appointed a Class B Manager or appointed a secretary.[119] But even if Plaintiff had a duty to do so, Defendants do not demonstrate or even argue that Plaintiff's failure to do so was material and justifies barring Plaintiff's relief.

Defendants claim that Plaintiff failed to notify the Company when it became a Member, but Defendants do not demonstrate or argue that Plaintiff was required to do so under the LLC Agreement.[120]

---

[118] Defs.' Pre-Trial Answering Br. at 24–28.

[119] *Id.* at 22–24.

[120] *Id.* at 23.

Defendants claim that Plaintiff, by not causing the Company to exercise an option against GSC previously, waived any arguments regarding the Class A Eligibility Provisions.[121] But even if Plaintiff or the Company waived the right to exercise an option when GSC failed to meet the Class A Eligibility Criteria—and Defendants did not prove that they did—it does not follow that Plaintiff waived its litigation position or acquiesced to GSC's attempts to remain a Class A Member.

Defendants claim that Plaintiff violated Section 13.1 of the LLC Agreement, which governs the dissolution of the Company. Section 13.1 states: "The Company shall be dissolved upon the occurrence of any of the following events ("Dissolution Events"): (a) the Members' voting to dissolve the Company; (b) the expiration of the Initial Term; or (c) as may be otherwise required by the Act."[122] Defendants claim that since the Members did not vote on dissolution, Plaintiff breached this provision when it wound down operations.[123] But Plaintiff did not file for dissolution of the Company. Covenant shut down the Surgery Center's operations and terminated its Management Agreement with the Surgery Center.[124] This defense also fails.

Defendants' affirmative defenses do not bar Plaintiff's claims for relief.

---

[121] *Id.* at 26–28.

[122] LLC Agreement § 13.1.

[123] Defs.' Pre-Trial Answering Br. at 28–30.

[124] JX-11; PTO ¶ 26.

24

## III.  CONCLUSION

GSC is no longer a Class A Member and Williams is no longer a Class A Manager under the LLC Agreement.  But GSC retains the equity position associated with its ownership of Class A Units.  Judgment on Count I is entered in favor of Plaintiff.

The LLC Agreement contains a fee-shifting provision,[125] and Defendants do not dispute its application.[126]  Plaintiff is entitled to fees and costs, including reasonable attorneys' fees and costs, incurred in connection with this action.[127] Plaintiff must prepare a form of Final Order and Judgment reflecting this decision, including the amount of fees and expenses it has incurred.  Plaintiff must send that form of order to Defendants, along with an affidavit supporting its fee and expense figure.  The parties must meet and confer over any disputes concerning the form of order.  If the parties cannot resolve their disputes, they may submit competing proposed forms of order.  Otherwise, the parties must submit a stipulated form of order for the court's review.

---

[125] LLC Agreement § 15.12.

[126] Defs.' Pre-Trial Answering Br. at 30–31.

[127] LLC Agreement § 15.12.